**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1523**

EDDIE STEWART,

       Plaintiff – Appellant,

   v.

GES RECYCLING SOUTH CAROLINA LLC,

       Defendant – Appellee.

Appeal from the United States District Court for the District of South Carolina, at Spartanburg.  Jacquelyn Denise Austin, District Judge.  (7:21-cv-01782-JDA)

Argued:  January 31, 2025               Decided:  August 13, 2026

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded by published opinion.  Judge King wrote the majority opinion, in which Judge Wynn joined.  Judge Quattlebaum wrote a dissenting opinion.

**ARGUED:**  Geraldine Sumter, FERGUSON, CHAMBERS & SUMTER, P.A., Charlotte, North Carolina, for Appellant.  Benjamin Paul Fryer, FORDHARRISON, LLP, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Chandler Bryant, FERGUSON, CHAMBERS & SUMTER, P.A., Charlotte, North Carolina, for Appellant.  Brianna L. Schill, FORDHARRISON, LLP, Spartanburg, South Carolina, for Appellee

KING, Circuit Judge:

In this employment discrimination action on appeal from the District of South Carolina, plaintiff Eddie Stewart contests the district court's Opinion and Order of May 7, 2024, insofar as the court awarded summary judgment to defendant GES Recycling South Carolina LLC ("GES") on Stewart's claim of retaliatory discharge under 42 U.S.C. § 1981. *See Stewart v. GES Recycling S.C. LLC*, No. 7:21-cv-01782 (D.S.C. May 7, 2024), ECF No. 70 (the "Summary Judgment Opinion"). As explained herein, we vacate the award of summary judgment to GES on Stewart's retaliatory discharge claim and remand for further proceedings.

I.

Plaintiff Stewart filed the original Complaint in this action on June 14, 2021, asserting three 42 U.S.C. § 1981 claims against GES, for (1) a racially hostile work environment, (2) race discrimination in training and promotion opportunities, and (3) retaliatory discharge for complaining about the discriminatory treatment. The same § 1981 claims are alleged in Stewart's operative Amended Complaint of June 15, 2021. Following discovery, GES moved for summary judgment as to all three claims.

A.

The summary judgment record reflects that GES is one of three subsidiaries in the United States of GESCRAP Group, a Spanish multinational corporation engaged in the recycling of industrial metal waste, or "metal scrap." Plaintiff Stewart, who is African American, was employed as a driver for about four months — from February to June 2017

2

— at the GES plant in Union County, South Carolina. Stewart's job involved collecting metal scrap from other sites and hauling it to the GES plant. His work was directed by manager Adam Gordon, as well as by fellow driver Justin Yarbrough (sometimes spelled "Yarborough" in the record), who acted as a foreman. Both Gordon and Yarbrough are white. Also in management at the GES plant were Ander Garcia and the direct supervisor of Gordon and Garcia, Rodolfo Baroja.

1.

According to plaintiff Stewart, the GES plant was a workplace where profane language was commonly used by and between workers and management, without objection from either side. But Stewart has protested that the GES plant was also a hostile work environment, where he was subjected to racial harassment that included the unwelcome and repeated use of the exceedingly offensive slur "n*****."[1]

Stewart has recounted multiple instances of racial harassment, mostly perpetrated by or otherwise related to Yarbrough, as detailed below.

- While working on a paid holiday (indicated to be Good Friday, April 14, 2017), Stewart and an African American coworker got in the bed of a pickup truck being driven by Yarbrough, prompting Yarbrough to say, "Man, one of you all come and get in the front, I don't want to

---

[1] We have sanitized the racial epithet repeatedly encountered by Stewart at the GES plant by replacing that abhorrent term with "n*****." In so doing, we do not mean to diminish the impact of that slur. *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 225 n.1 (4th Cir. 2022).

3

be looking like the n***** slave driver." *See* J.A. 79; *see also id.* at 160-61, 193.[2]

- That same day, Yarbrough told Stewart that a white crane operator had referred to Stewart and other African American drivers as "stupid n*****s." *See* J.A. 75, 160, 193. Stewart responded by asking Yarbrough both why the white crane operator had not been fired for his comment and why Yarbrough was "even telling [Stewart] what [the white crane operator] said." *Id.* at 77. Although Yarbrough then noted that it was not him, but the white crane operator, who had made the "stupid n*****s" comment, Stewart emphasized that Yarbrough was "the only person I see in my face saying it" and that Yarbrough "better get out of my face with it." *Id.* at 78.

- Yarbrough was part of a Facebook group that posted racist cartoons, which Yarbrough repeatedly showed to Stewart and other employees while they were on breaks. One such cartoon, depicting a field full of white horses with one black horse in the middle, was captioned, "Everywhere you go there's a n*****." *See* J.A. 100. Another, depicting a long-legged chicken dressed in a basketball jersey and headband, said something along the lines of, "I'd like to see a n***** catch this chicken." *Id.* at 100, 163, 193; *see also id.* at 332 (copy of cartoon with similar caption, "Bet KFC won't catch this n***a"). Not wanting to see the racist cartoons, Stewart learned to walk away when Yarbrough was approaching to show them.

- Yarbrough also regularly brought his son (estimated by Stewart to be age 11 or 12) to the GES plant, where on at least three occasions the boy addressed employees gathered in the breakroom, including Stewart, as "sand n*****s." *See* J.A. 79-88. The boy's use of racial slurs caused both African American and white employees to discuss amongst themselves that the boy was "racist" and that Yarbrough was "[r]aising [his son] to be just like him." *Id.* at 88. Indeed, Yarbrough would encourage his son's use of racial slurs, "laugh[ing] as if it[']s funny." *Id.* at 162.

---

[2] Stewart's version of events is drawn from a written statement he made in June 2017 to GES, *see* J.A. 193-94; his subsequent intake questionnaire with the U.S. Equal Employment Opportunity Commission, *id.* at 153-64; and excerpts of his deposition testimony in these proceedings, *id.* at 66-152, 274-329, 352-59. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

● In early June 2017, while both Stewart and Yarbrough were working a night shift, Yarbrough flagged Stewart down as if there were something of importance. But Yarbrough then pointed to an oil spot on his arm and said to Stewart: "Look at that. What is that?" *See* J.A. 77. When Stewart answered that it was "oil," Yarbrough replied that it was instead "a black spot like you" or "your black ass." *Id.* at 77, 91, 162.

Prior to June 13, 2017, Stewart did not make any complaints of racial harassment to Gordon or any other managers at GES. As Stewart has explained, management was already well aware that such harassment was occurring — as use of the term "n*****" and other harassing acts often occurred in the presence of the plant's higher ups — with no effort made to punish or otherwise stop it. For example, Yarbrough told Stewart that the white crane operator's "stupid n*****s" comment was heard by Baroja, who took no disciplinary action against the white crane operator. *See* J.A. 160-61. Stewart himself witnessed Yarbrough freely perpetrating harassment with the knowledge and even in the presence of Gordon.

Furthermore, Stewart feared that if he complained, he would be subject to retaliation. That fear arose from a warning Gordon had given Stewart on the day Stewart was hired by GES not to associate with two particular African American employees "because they complain about discrimination" and "always talk about the company disc[r]iminates against blacks." *See* J.A. 160, 298. Thereafter, Yarbrough advised Stewart that the complaining African American employees would not "be there much longer because they would figure out a way to fire them." *Id.* at 160. And Stewart perceived that Gordon was otherwise "targeting" those men for their complaints, in that, for example, one of them lost a promotion to the less-senior Yarbrough, even though the promotion was

5

supposed to be based on seniority. *Id.* at 298-300. Meanwhile, Stewart believed that

Gordon was already denying him opportunities, based on his race, to train as a crane

operator and thereby qualify for a higher pay rate. As Stewart thus saw it, he "couldn't

complain" to Gordon or "to the people in the office" about racial harassment or other

discriminatory treatment. *Id.* at 298. That is, Stewart "felt like if I had a complaint to them

about what was happening they be trying to figure out a way to get rid of me too." *Id.* at

357.

According to Stewart, however, he was driven to complain of discrimination on

June 13, 2017, after Gordon himself perpetrated racial harassment at the GES plant.

Stewart's account of that workday, which quickly ended in his suspension, includes the

following details.

- The racial harassment perpetrated by Gordon on June 13, 2017, involved Gordon observing and then imitating two African American employees coming off the day shift who each had greeted Stewart with a fist "pound" as he stood against a wall playing a game on his cell phone while waiting to start his night shift. *See* J.A. 98. In his imitation, Gordon poked out his bottom lip as if he were "one of the black guys with big bottom lips" and approached Stewart with his fist up "to give [Stewart] the pound." *Id.* at 98-99. Stewart refused to participate in a fist pound with Gordon. Instead, Stewart "looked at [Gordon's] face," "looked at his hand," and then "looked back at my game." *Id.* at 98.

- Stewart shortly thereafter came across Gordon in the breakroom, where, in the presence of at least one other GES employee, they had words about Stewart's lack of training as a crane operator. Gordon asked Stewart, "Have you been trained to operate . . . the crane?" *See* J.A. 133. Stewart responded, "Have you trained me to operate the crane[,] motherfucker?" *Id.* Gordon acknowledged he had not but challenged Stewart with, "Why you never come in here on your days off and operate the crane?" *Id.* To that Stewart replied, "Because

6

every time I come in on my days off to operate the crane [I instead end up] running my normal job," which "ain't what I want." *Id.*

- During the same exchange in the breakroom, Stewart alluded to the racial harassment he had encountered at the GES plant — including the harassment just perpetrated by Gordon himself — telling Gordon that "I don't like being around all you motherfuckers like that 'cause they childish." *See* J.A. 133.

- Obviously angered by Stewart's comments, Gordon left the breakroom but soon called Stewart on his cell phone and told him to come to Gordon's office. Once Stewart did as instructed, Gordon slammed the office door and ordered Stewart to "[s]it down." *See* J.A. 134. Stewart retorted, "I don't feel like sitting down today, motherfucker." *Id.* Gordon then prodded Stewart to "tell me what the problem is," asking: "What's going on? What's wrong?" *Id.* Stewart suggested that Gordon knew exactly what the problem was — saying, "Man, why you playing me like that?" — but went on to say he was "tired of this bullshit place" and to make express complaints of discriminatory treatment. *Id.* at 134, 193.

- In his complaints to Gordon on June 13, 2017, Stewart brought up Gordon's earlier warning to avoid the two African American employees who complained of discrimination. Stewart told Gordon that it had become apparent to Stewart that those employees were "right" to complain, as Gordon "did the same thing to [Stewart]." *See* J.A. 135. Stewart specifically suggested that his lack of training as a crane operator was racially discriminatory and that Gordon would "not let a black man move up in this company." *Id.* at 156-57. Additionally, Stewart protested that "you all got all those people running around here and calling people 'stupid n*****s' and stuff, never ain't nothing been done about that." *Id.* at 136. Stewart also expressly complained of Yarbrough's "n***** slave driver" comment and racist "chicken" cartoon. *Id.* at 157, 193.

- Stewart closed his discrimination complaints by telling Gordon "it's real fucked up how the[y] run shit." *See* J.A. 157. Gordon responded to Stewart's complaints by asking if Stewart was "going to quit." *Id.* at 136. After Stewart answered, "No," Gordon directed Stewart to "go ahead and clock out then" and informed him that he was "suspended for the day." *Id.*

7

- Upon Gordon's announcement of his suspension, Stewart noted the unfairness of it, saying to Gordon, "You going to call me in here knowing I was already mad and you going to play me like a kid, and then soon as I tell you what my problem is I get suspended for it." *See* J.A. 136. With Gordon leaving the office through the door to the outside, Stewart added, "Man you know that's messed up." *Id.* To that, Gordon "took off running," prompting Stewart to say, "What you running for" and "You running 'cause you know you did wrong, man. You know you did wrong." *Id.*

- Now outside, Stewart overheard Gordon on the phone, telling a worker who had been scheduled to start later in the night shift to "[c]ome on in [because Stewart has] been suspended for the day." *See* J.A. 136-37. That led Stewart to rebuke Gordon: "Damn near be telling people my business. What my business got to do with somebody else?" *Id.* at 137. Stewart also rebuked: "[H]ow you going to suspend me and you ask me what the problem was and I told you[,] fat mothe[r]fucker. But it[']s ok for motherfuckers to call us stupid n*****s. You ain't shit[,] motherfucker." *Id.* at 194.

- After rebuking Gordon, Stewart was told to be quiet by a GES employee (identified by GES as Tiffany Robertson) who had also just come outside. Stewart responded to Robertson, "Look, I don't mean no harm, but you ain't got nothing to do with this, go the fuck on back in there 'cause I ain't talking to you." *See* J.A. 137.

- At that point, Stewart was approached by Garcia, who asked Stewart what was going on. Stewart explained to Garcia, "Man, that dude [Gordon] playing me like a kid, man," elaborating that Gordon "called me in the office, ask me what my problem was and I tell him," but then "suspend[ed] me for telling [him] something that he knew I was already mad about." *See* J.A. 137. Additionally, Stewart told Garcia that he was "tired of this shit they doing." *Id.* at 194. In response, Garcia instructed Stewart "to go ahead and leave" the GES plant, while promising that Garcia "would talk to [Stewart] tomorrow." *Id.* In Stewart's words, Garcia "calm[ed] me down and t[old] me he w[ould] find out what[']s going on [and] have me come in the next day and talk to me about it. So I left. I was very very upset." *Id.* at 157-58.

As Stewart has recounted, he followed Garcia's instructions and returned to the GES plant on June 14, 2017, though he had not otherwise been scheduled to work that day.

8

Stewart met with both Garcia and Baroja, who had Stewart give a written statement regarding the events of June 13, 2017.  In that statement, Stewart described:  his complaints to Gordon about Stewart's lack of training as a crane operator; the racial harassment at the GES plant, including Yarbrough's "n***** slave driver" comment, Yarbrough's racist "chicken" cartoon, and the unpunished "stupid n*****s" comment that Yarbrough had reported to Stewart; and the retaliation threatened against and suffered by employees who complained of discrimination.  The statement also addressed Stewart's own suspension upon making his complaints to Gordon, as well as the impropriety of the suspension.  Stewart was open about his use of profane language, documenting in the statement that, inter alia, he had called Gordon a "motherfucker" and a "fat motherfucker."

At the conclusion of the June 14, 2017 meeting, Stewart was told to call the next day before coming back for that day's scheduled shift.  When Stewart then called on June 15, 2017, he spoke with either Garcia or Baroja, who informed Stewart that he was "still suspended" and would have "to talk to somebody from Spain" who "was flying in to talk to [Stewart]."  *See* J.A. 148-49.  Stewart was advised that he should wait to be contacted about a future meeting.

According to Stewart, it was not until June 21, 2017, that he was contacted and directed to attend a meeting that same day, with Garcia and another man (identified by GES as Human Resources Manager Oscar Azkona).  During that meeting, Garcia and Azkona "spoke [with each other] in another language," and only Garcia spoke, in English, directly to Stewart.  *See* J.A. 149.  Garcia told Stewart, "We understand you had some concerns, but the way you talked to [Gordon] is something this company cannot tolerate;

9

and therefore, we have to terminate you." *Id.* at 151.  Thereupon, Garcia asked Stewart, "You got any questions?" *Id.*  Stewart answered, "No," and Garcia then provided Stewart with his final pay and had him turn in his uniforms. *Id.*

2.

In a declaration made under penalty of perjury, a witness for plaintiff Stewart, his former coworker Kenrick Denning, averred that while he was employed at the GES plant for approximately one year, "profanity was widely used by workers and management." *See* J.A. 330.  Denning further stated that "[r]acial jokes and remarks were prevalent during the time that I worked"; that "Gordon made racial remarks himself and was present when racial remarks and jokes were made, but never did anything to warn employees that such conduct was not appropriate"; and that "Gordon was often present when [Yarbrough] made racist remarks." *Id.* at 331.

According to Denning, "I let it be known that I did not appreciate the racial comments being made" and also "talked about the difference in the pay being offered to African-Americans [including] me." *See* J.A. 331.  In response, Gordon warned Denning "that if I continued talking about racism that I would be fired" and "told me that I needed to stop talking about the raises." *Id.*  Ultimately, Denning "resigned my position because of the discriminatory treatment afforded to African-Americans and because the company did nothing to stop the racial comments and jokes." *Id.*[3]

---

[3] Notably, Denning was one of the two African American employees who Stewart was warned by Gordon to avoid "because they complain about discrimination" and "always talk about the company disc[r]iminates against blacks." *See* J.A. 160, 298.

10

3.

For its part, GES proffered witnesses who disputed plaintiff Stewart's claims of a racially hostile work environment, race discrimination in training and promotion opportunities, and retaliatory discharge for complaining about the discriminatory treatment. Specifically, GES tendered two declarations of Gordon, a declaration of Garcia, and a declaration of the white crane operator who allegedly uttered the "stupid n*****s" comment. All those declarations were made under penalty of perjury. Additionally, GES produced internal records, including an unsworn and undated written account by Gordon of the events of June 13, 2017, as well as two documents concerning an internal investigation of Yarbrough following Stewart's termination.

In Gordon's written account of the events of June 13, 2017, once he and Stewart were in Gordon's office, Gordon felt that Stewart "was attempting to intimidate me" and created "a hostile work environment" by refusing Gordon's direction to "sit down." *See* J.A. 206. Stewart instead "stood in front of my desk," "began yelling and cursing," and complained of racial harassment perpetrated by Gordon and in Gordon's presence, as well as race discrimination in training and promotion opportunities. *Id.* When Gordon responded to Stewart's discrimination complaints by contesting them, Stewart "began yelling and cursing again." *Id.* Gordon then "asked [Stewart] to leave and go home" and told Stewart that "[h]e was suspended for that shift." *Id.* Gordon followed Stewart out of the office, and, once outside, called the replacement worker for Stewart and said that Stewart "would not be working tonight." *Id.* "I[n] that moment, [Stewart] stated that he was leaving and was fired," and Gordon told Stewart "that he was not fired but suspended

11

for the night." *Id.* To that, Stewart "began yelling and cur[s]ing again, and backed [Gordon] into the barrier wall and against a fence where I felt trapped." *Id.* Gordon "was able to remove myself from the situation, and move away from [Stewart]." *Id.*

At that point in Gordon's written account, Garcia — who the written account refers to as "our CFO" — "and our administration person[ne]l came out of their offices due to the commotion." *See* J.A. 206. Garcia "tried to speak calmly with [Stewart] as did one of the administ[rato]rs." *Id.* In response, Stewart "began yelling and cursing at those employees" and "calling them names." *Id.* Garcia then "calmly escorted [Stewart] around the building and out to the parking lot to leave." *Id.* Sometime thereafter, Gordon himself "left for the day" after speaking "briefly with [Garcia]" and being asked "to document what took place." *Id.* (suggesting that the written account was prepared in response to Garcia's request).

In contrast to his written account, Gordon's first declaration contains a much shorter version of the events of June 13, 2017. The first declaration asserts as follows:

> On or about June 13, 2017, Stewart instigated an altercation with me. Stewart yelled and cursed at me during this altercation. I felt threatened during this altercation because Stewart was physically close to me and he was simultaneously acting in a belligerent manner. Stewart also called an employee, Tiffany Robertson, a "bitch" after she came out to calm Stewart down during this altercation.

*See* J.A. 213. Gordon stated in his first declaration that "Stewart was suspended and subsequently terminated due to this belligerent outburst." *Id.* Thereafter, in his second declaration, Gordon specified that "Stewart was solely suspended and terminated due to his tirade against me on June 13, 2017." *Id.* at 362.

12

Meanwhile, Garcia averred in his declaration that he learned of, but did not witness, "an altercation between Stewart and Gordon." *See* J.A. 217. That is, Garcia stated that "I did not witness the altercation, but I did hear [a] commotion at the end of the altercation," which "made me go out of the office I was in to check on what was going on." *Id.* Garcia "learned that the commotion was an altercation between Stewart and Gordon," and "Stewart was suspended while GES conducted an investigation of the incident." *Id.* GES "ultimately decided to terminate Stewart's employment" because it "simply could not tolerate such belligerent and insubordinate conduct from an employee." *Id.* The decision was made by Azkona and Baroja, and Garcia "was the individual tasked with informing Stewart of his termination" during Azkona and Garcia's June 21, 2017 meeting with Stewart. *Id.*

As for the internal investigation of Yarbrough, the two documents produced by GES reflect that GES opened — and also closed — the investigation on June 22, 2017, the day after Stewart's termination. By the document opening the investigation, GES notified Yarbrough of an allegation that "[o]n June 14, when you were with 2 companions, you made the following comment[:] '*Sit one of you in the front part with me that I do not want people think that I'm a slave's driver.*'" *See* J.A. 203.[4] GES accorded Yarbrough two days "to submit in writing any disclaimers and / or claims you deem appropriate." *Id.* The record does not contain a written response from Yarbrough, but according to Garcia's

---

[4] In the district court proceedings, GES acknowledged that the use of the date "June 14" was apparently "a scrivener's error" and that the correct date is "April 14, 2017, Good Friday." *See* J.A. 52 n.8.

13

declaration, "Yarbrough admitted he used the term 'slave driver' because was driving with [Stewart and another African American employee] and they were sitting in the back while Ya[r]brough was in the front alone." *Id.* at 217.

By the document then promptly closing the investigation, GES informed Yarbrough that "[w]e have received your allegations and after analyzing them, *valuing your repentance and your trajectory in the Company*, we inform you that by this time, the consequences of your action will be limited to *written warning*." *See* J.A. 204. Yarbrough was further advised that "if this type of action is repeated again, we will be obliged to take harder actions." *Id.*

### B.

GES's summary judgment motion was referred to a magistrate judge for recommendations to the district court. By the Report of Magistrate Judge of September 7, 2023, the magistrate judge recommended awarding summary judgment to GES on plaintiff Stewart's hostile work environment and race discrimination claims, but denying summary judgment to GES on Stewart's retaliatory discharge claim. *See Stewart v. GES Recycling S.C. LLC*, No. 7:21-cv-01782 (D.S.C. Sept. 7, 2023), ECF No. 55 (the "Report").

The magistrate judge concluded that the hostile work environment claim fails for, inter alia, being time-barred. *See* Report 12-13 (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016), for the proposition that "[h]ostile work environment claims under § 1981 are subject to a four year limitation period"). That is so, the magistrate judge explained, because the relevant acts of racial harassment — mainly

14

those allegedly perpetrated by Yarbrough — occurred more than four years before Stewart initiated this action on June 14, 2021.

Notably, the magistrate judge considered whether "Gordon's alleged conduct on June 13, 2017, [could] salvage [Stewart's] hostile work environment claim and bring it within [§] 1981's statute of limitations under the continuing violation doctrine." *See* Report 14 (recognizing that, under the continuing violation doctrine as elucidated in *Guessous*, 828 F.3d at 222 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)), if "an act *contributing* to the claim occurs within the filing period," then "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability"). The magistrate judge determined that Gordon's alleged conduct could not salvage the hostile work environment claim because that conduct, i.e., Gordon's imitation of the two African American employees who had just given Stewart fist pounds, did not include any "racial or derogatory comments whatsoever" and thus was not "racially offensive." *Id.* As the magistrate judge saw it, "[n]othing in the record — other than [Stewart's] own interpretation of Gordon 'poking out' his lips — suggests that the conduct was based on race." *Id.* at 15.

Next, the magistrate judge concluded that the claim of race discrimination in training and promotion opportunities fails for, inter alia, also being time-barred. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291-92 (4th Cir. 2004) (observing that such § 1981 discrimination claims, like § 1981 hostile work environment claims, "are governed by [a] four-year federal statute of limitations"). Here, the magistrate judge explained that — "consistent with the fact that [Stewart] was suspended from June 13, 2017, until his

15

termination of employment on June 21, 2017" — he "failed to provide any evidence that he asked to be trained on the crane and was denied the opportunity after June 14, 2017." *See* Report 20.

Lastly, however, with respect to the indisputably-timely retaliatory discharge claim, the magistrate judge concluded that there is a genuine dispute of material fact as to whether retaliation was a but-for cause of Stewart's termination. *See* Report 22-23 (quoting *Guessous*, 828 F.3d at 217, for the proposition that "[r]etaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action" (internal quotation marks omitted)). "Clearly," the magistrate judge emphasized, "issues of material fact remain." *Id.* at 23.

## C.

Following the issuance of the Report on September 7, 2023, the parties timely filed objections to the magistrate judge's recommendations. Plaintiff Stewart objected to the recommendation to award summary judgment to GES on the hostile work environment claim, but he did not object to the recommendation to award summary judgment to GES on the claim of race discrimination in training and promotion opportunities. GES objected to the recommendation to deny its request for summary judgment on the retaliatory discharge claim. By the Summary Judgment Opinion of May 7, 2024, the district court resolved to award summary judgment to GES on all three of Stewart's claims.

As to the hostile work environment claim, the district court rejected the magistrate judge's determination that Gordon's imitation of the two African American employees on June 13, 2017 — which the court referred to as the "Lip Incident" — was not based on race

16

or racially offensive. *See* Summary Judgment Opinion 9 n.6. The court explained that a jury could credit Stewart's description of the Lip Incident and reasonably understand "that Gordon was mockingly imitating the two African-American men who had just fist bumped [Stewart]," that Gordon "imitated their 'big bottom lips' by poking out his lower lip," and "that Gordon's imitating the African-American men in this way was racially offensive, especially in light of the hostility that Gordon had expressed in the past concerning African-American employees' complaints of discrimination." *Id.*

In any event, the district court concluded that the hostile work environment claim is yet time-barred, in that "[t]he Lip Incident, the last unwelcome and offensive conduct [Stewart] testified that he experienced, occurred on June 13, 2017, which is more than four years prior to [his] filing the Complaint on June 14, 2021." *See* Summary Judgment Opinion 9. On that ground, the court awarded summary judgment to GES on the hostile work environment claim.

Similarly, the district court awarded summary judgment to GES on the claim of race discrimination in training and promotion opportunities. *See* Summary Judgment Opinion 8 n.5 (noting the lack of objection to, and adopting, the magistrate judge's conclusion that the race discrimination claim is time-barred).

Turning to the retaliatory discharge claim, the district court disagreed with the magistrate judge's conclusion that there is a genuine dispute of material fact as to whether retaliation was a but-for cause of Stewart's termination. Applying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court ruled that "even assuming [Stewart] can establish a prima facie case of retaliation" —

17

particularly because of the close temporal proximity between his discrimination complaints and subsequent termination —Stewart has failed to meet "his burden of demonstrating that GES's proffered reason [for the termination] is merely a pretext for retaliation." *See* Summary Judgment Opinion 12-13.

The district court premised its ruling on the proposition that GES has always claimed that Stewart "was terminated based on the insubordinate and belligerent conduct that he exhibited toward Gordon," and not "simply for using profanity." *See* Summary Judgment Opinion 15. In so doing, the court discerned that there is no "conflicting evidence concerning the reason that [GES's designated decisionmakers] Azkona and Baroja decided to terminate [Stewart]." *Id.* at 14. For support, the court equated Stewart's evidence that Garcia told Stewart the termination was because of "the way you talked to [Gordon]," with Garcia's declaration that the termination was because of Stewart's "belligerent and insubordinate conduct." *Id.* (citations omitted).

Concomitantly, the district court interpreted the record to be conclusive that Stewart in fact engaged in the "belligerent and insubordinate conduct" claimed by GES. In that regard, the court emphasized that "the outburst [Stewart] directed toward Gordon was so disruptive that another employee [Robertson] ended up asking [Stewart] to be quiet and Garcia eventually intervened to attempt to calm [Stewart] down and then told him to go home." *See* Summary Judgment Opinion 15 (internal quotation marks omitted).

As a result of this view of the facts and the inferences drawn therefrom, the district court deemed Stewart's "evidence that profanity was commonplace at GES" to be irrelevant and Stewart's "focus on [his] use of profanity" to be "a straw man." *See*

18

Summary Judgment Opinion 14-15. Additionally, the court faulted Stewart for having "not identified any other GES employee who ever addressed his supervisor in such an insubordinate and belligerent manner without suffering comparable consequences." *Id.* at 15.

The district court considered — but dismissed as unhelpful to Stewart — Stewart's evidence "that Gordon had warned [Stewart] early on in his employment to stay away from two black employees who had complained of discrimination." *See* Summary Judgment Opinion 15. The court explained:

> At most, . . . this evidence tends to show that Gordon harbored retaliatory animus. As noted, however, although Gordon imposed the initial, one-day suspension on June 13, 2017, [Stewart] has not forecasted any evidence that Gordon had any involvement in any decision regarding [Stewart] after that. In fact, the day after the suspension, which was [Stewart's] day off, GES had [Stewart] come in to write a statement providing his account of the events in question. It was then the following day — when [Stewart] had been scheduled to return to work — that [GES] informed [Stewart] that his suspension would be continuing indefinitely . . . .

*Id.* at 15-16 (citations omitted).

The district court further observed that Stewart had not made "any argument as to why any retaliatory animus on Gordon's part could be imputed to GES," such as "under a 'cat's paw' theory of liability." *See* Summary Judgment Decision 16 n.9 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011), for the proposition that under the cat's paw theory, "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the . . . employment action, then the employer is liable" (alterations in original) (footnote omitted)). According to the court, "a reasonable jury would have no basis for imputing

19

any retaliatory animus from Gordon to GES concerning [Stewart's] termination," in that

Stewart failed to "forecast[] evidence that Gordon intended to take any action against

[Stewart] beyond suspending him for one day, that Gordon recommended any punishment

beyond that initial suspension, or that Azkona and Baroja involved Gordon in any way in

the decision to terminate [Stewart]." *Id.*

Summarizing its decision on the retaliatory discharge claim, the district court then

stated:

> Despite the temporal proximity between [Stewart's race discrimination]
> complaints and his [subsequent] termination, given the belligerent and
> insubordinate manner in which [Stewart] presented his complaints, and given
> GES's subsequent investigation, no reasonable jury could conclude that GES
> would not have terminated [Stewart] but for the fact that [Stewart's]
> objectionable conduct occurred while he was complaining of race
> discrimination.

*See* Summary Judgment Opinion 16-17.  By accompanying citations, the court analogized

this case to cases involving plaintiffs who were terminated after engaging in "intimidating"

and "threatening behavior." *Id.* at 17 (citing, inter alia, *Holland v. Wash. Homes, Inc.*, 487

F.3d 208, 218 (4th Cir. 2007)).  The court thereby awarded summary judgment to GES on

the retaliatory discharge claim.

* * *

Plaintiff Stewart timely noted this appeal, in which he contests solely the district

court's summary judgment award to GES on the retaliatory discharge claim.  We possess

jurisdiction pursuant to 28 U.S.C. § 1291.

20

II.

We review de novo a district court's award of summary judgment. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Like the district court, we are obliged to view the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

A plaintiff may avert summary judgment on a 42 U.S.C. § 1981 retaliatory discharge claim by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether retaliation motivated the employer's termination decision, or by proceeding under the familiar *McDonnell Douglas* burden-shifting framework. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Ultimately, the plaintiff must demonstrate "that retaliation was a but-for cause of [the termination]." *Id.* at 217 (internal quotation marks omitted). "This requires proof that the [retaliatory discharge] would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

The *McDonnell Douglas* burden-shifting framework first requires the plaintiff to establish a prima facie case of retaliation, i.e., that (1) he engaged in a protected activity, (2) the employer took an adverse employment action against him by discharging him; and (3) a causal relationship existed between the protected activity and the discharge. *See Guessous*, 828 F.3d at 216-17. Regarding the third element, "[i]t is well-established that

21

close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation." *See Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (internal quotation marks omitted).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a non-retaliatory reason for the discharge. *See Guessous*, 828 F.3d at 216-17. Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for retaliation. *Id.* At this juncture, "the plaintiff's burden to show pretext merges with the plaintiff's ultimate burden of [proving] that she was a victim of intentional [retaliation]." *Id.* at 217 (internal quotation marks omitted). Pretext may be shown in a variety of ways, including by evidence that the employer's proffered reason "is false" or has "changed over time." *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257-58 (4th Cir. 2025).

### III.

In contesting the district court's award of summary judgment to GES on his retaliatory discharge claim, plaintiff Stewart maintains that the court failed to view the facts and inferences drawn therefrom in the light most favorable to him and thereby failed to recognize that there is a genuine dispute of material fact as to whether retaliation was a but-for cause of his termination. We are constrained to agree.

### A.

We specifically reject the district court's ruling that, under the *McDonnell Douglas* burden-shifting framework, plaintiff Stewart has failed to demonstrate that GES's

22

proffered reason for the termination is a pretext for retaliation. As heretofore explained, the district court premised its pretext ruling on there being no dispute that (1) GES has always claimed that Stewart was terminated because of "belligerent and insubordinate conduct" beyond the mere use of profane language and (2) this "belligerent and insubordinate conduct" in fact occurred. In other words, the court saw it as undisputed that GES's proffered reason for the termination is true and has been consistent.

Properly viewing the facts and inferences drawn therefrom in the light most favorable to Stewart, however, there are genuine disputes of material fact as to whether GES's proffered reason "is false" or has "changed over time." *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257-58 (4th Cir. 2025). Consequently, Stewart "may establish pretext through evidence that [GES's] purported [non-retaliatory] reason for [the] termination is false." *See id.* at 257. Additionally or alternatively, Stewart may establish pretext through evidence that GES's purported reason for the termination has not been consistent, as "the fact that [GES] has offered different justifications at different times is, in and of itself, probative of pretext." *See id.* at 258 (citation modified).

1.

We begin by explaining why we reject the district court's view that there is no dispute the "belligerent and insubordinate conduct" claimed by GES in fact occurred. To review, the court saw it as a "given" fact that plaintiff Stewart "presented his complaints" to Gordon in a "belligerent and insubordinate manner," i.e., in an intimidating and threatening way. *See* Summary Judgment Opinion 16-17. In interpreting the record to be conclusive that Stewart engaged in this "belligerent and insubordinate conduct," the court

23

emphasized that "the outburst [Stewart] directed toward Gordon was so disruptive that [Robertson] ended up asking [Stewart] to be quiet and Garcia eventually intervened to attempt to calm [Stewart] down and then told him to go home." *Id.* at 15 (internal quotation marks omitted).

Stewart's account, however, involves no worse conduct than using profane language and perhaps raising his voice. As Stewart has underscored, it is only in GES's account that the purported "belligerent and insubordinate conduct" occurred. And because GES's account "differs considerably from" Stewart's, "[a] genuine issue of material fact exists regarding Stewart's alleged threatening behavior." *See* Br. of Appellant 11; *see also* J.A. 467 (advancing same argument in district court).

To be sure, Stewart's account does include the facts on which the district court relied, i.e., that Robertson told Stewart to be quiet and that Garcia intervened to calm Stewart down. But the appropriate inference is not that Robertson's and Garcia's actions were attributable to any purported "belligerent and insubordinate conduct" on the part of Stewart.

In so saying, we "take into consideration the full events as they transpired on June 13, 2017," as Stewart has "urge[d]" both this Court and the district court to do. *See* Br. of Appellant 12; J.A. 468. Pursuant to Stewart's account:

- By June 13, 2017, Stewart had endured months of racial harassment and perceived race discrimination at the GES plant, yet Stewart felt he had to refrain from complaining, both because management already knew of and tolerated racial harassment in the workplace and because Gordon had expressed retaliatory animus against complaining workers;

24

- Stewart was finally driven to complain on June 13, 2017, after Gordon himself perpetrated harassment (in what the district court recognized to be the racially offensive "Lip Incident") and after Stewart and Gordon had words in the breakroom about Stewart's lack of training as a crane operator;

- Though Stewart only alluded in the breakroom to the racial harassment he had encountered, he obviously angered Gordon;

- Gordon then called Stewart to Gordon's office, where Gordon pretended not to understand why Stewart was upset and goaded Stewart into detailing his discrimination complaints;

- Once Stewart detailed his discrimination complaints, Gordon sought, without success, to coerce Stewart to quit and then promptly suspended him;

- As Stewart protested the suspension, Gordon evidenced a guilty conscience by running outside; and

- Now also outside, Stewart overheard Gordon calling a replacement worker and sharing that Stewart had been suspended, prompting Stewart to rebuke Gordon for disclosing the suspension and to again rebuke Gordon for imposing the suspension.

It was at this point in Stewart's account that Robertson told Stewart to be quiet. Thereafter, Stewart was approached and calmed by Garcia. As Stewart described himself, he was "very very upset." *See* J.A. 158.

Contrary to the district court's view, the appropriate inference to be drawn from the fact that Robertson told Stewart to be quiet is that Robertson simply objected to the volume or substance of what she heard Stewart say to Gordon. Indeed, a directive to be quiet is hardly an expected response to the type of "belligerent and insubordinate conduct" claimed by GES. Moreover, although it can be inferred that Stewart spoke loudly enough to be heard by Robertson, nowhere in the record is there clear evidence as to how loud that was.

25

Nor is there clear evidence that Stewart spoke so loudly as to be intimidating or threatening. As for the fact that Garcia thereafter calmed Stewart, the appropriate inference is that Stewart needed calming because he was admittedly "very very upset." Of course, one can be "very very upset" without being intimidating or threatening.

At bottom, neither the facts cited by the district court nor any other aspect of Stewart's account compels a conclusion that Stewart engaged in the "belligerent and insubordinate conduct" claimed by GES. Rather, Stewart's behavior can be viewed as a non-intimidating, non-threatening, and wholly understandable response to the series of events leading up to and occurring on June 13, 2017.[5]

### 2.

That brings us to our explanation of why we reject the district court's view that there is no dispute GES has always blamed plaintiff Stewart's termination on "belligerent and insubordinate conduct" beyond the mere use of profane language. On this matter, the court discerned no conflicting evidence concerning GES's purported reason for the termination, as the court equated Stewart's evidence that he was told the termination was because of

---

[5] Although not necessary to our decision, we observe that Stewart makes an additional cogent point on appeal that he seemingly did not articulate in the district court: that GES's allegation of "belligerent and insubordinate conduct" is belied by the evidence that Stewart "was calmly escorted to his car by management" on June 13, 2017, and that GES had Stewart return to the plant the next day "to give a written statement" and then once again "to deliver the news of his termination." *See* Br. of Appellant 14. As Stewart puts it, "[a] rational jury could reject GES's characterization of Stewart's behavior since [GES] did not appear to be concerned about Stewart coming back to the workplace," such that there is "a genuine issue of material fact regarding [GES's] characterization of plaintiff as being threatening." *Id.*

26

"the way you talked to [Gordon]," with Garcia's declaration that the termination was because of Stewart's "belligerent and insubordinate conduct." *See* Summary Judgment Opinion 14 (citations omitted).

The appropriate inference to be drawn from Stewart's evidence, however, is that when Garcia told Stewart the termination was because of "the way you talked to [Gordon]," *see* J.A. 151, Garcia was referring to Stewart's use of profanity, and not to some other "belligerent and insubordinate conduct." This is an entirely reasonable and natural interpretation of Garcia's words, and it is clearly the way Stewart understood them.

Significantly, Stewart's arguments in these proceedings — in both this Court and the district court — plainly reflect an understanding that Garcia told Stewart he was being terminated for profanity alone. For example, Stewart has contended that "[t]here is a genuine issue of material fact whether [his] use of profanity was the basis for the termination or whether [his] complaints about the race discrimination was the real reason." *See* Br. of Appellant 8; *see also* J.A. 270.

Furthermore, Stewart has addressed whether profanity alone could be a plausible reason for the termination. In that regard, Stewart has maintained that his evidence "that profanity was widely used [at the GES plant]" — including former coworker Denning's declaration — "must be considered in evaluating GES's allegations that Stewart's language was so egregious that it warranted a termination." *See* Br. of Appellant 10; *see also* J.A. 467. Stewart has also highlighted evidence that he "had used the word motherfucker at least three times before Gordon told him he was suspended," asserting that "[i]f the use of the profanity was such an egregious event, one would think that Gordon would have

27

suspended Stewart immediately, especially when the first two times occurred in the [breakroom] in the presence of another employee." *See* Br. of Appellant 12; *see also* J.A. 468-69.

The district court itself acknowledged that Stewart presented "evidence that profanity was commonplace at GES" and "focus[ed] on [his] use of profanity." *See* Summary Judgment Opinion 14-15. But because the court thought it undisputed that GES has always blamed the termination on "belligerent and insubordinate conduct" beyond the mere use of profane language, the court deemed Stewart's profanity evidence to be irrelevant and his focus on profanity to be "a straw man." *Id.* at 15.

Instead, the district court should have recognized that Stewart proffered the profanity evidence and focused on his use of profanity because of an important factual dispute regarding the consistency of GES's purported reason for the termination. That dispute involves whether GES has always blamed the termination on "belligerent and insubordinate conduct" beyond the mere use of profanity, or whether GES first relied on the profanity and only later changed its excuse to some other "belligerent and insubordinate conduct."

* * *

Simply put, when viewed in the light most favorable to plaintiff Stewart, the record reflects that GES told Stewart one thing (that the termination was based solely on his admitted use of profanity) and is now claiming another (that the termination was because of other "belligerent and insubordinate conduct" that Stewart says never occurred). Contrary to the district court, this engenders genuine disputes of material fact under the

28

*McDonnell Douglas* burden-shifting framework as to whether GES's claim of "belligerent and insubordinate conduct" is a pretext for retaliation and, thus, whether retaliation was a but-for cause of Stewart's termination. Specifically, there are genuine disputes of material fact as to whether GES's claim of "belligerent and insubordinate conduct" is false or has changed over time. We therefore vacate the court's summary judgment award to GES on Stewart's retaliatory discharge claim and remand for further proceedings.[6]

### B.

We take a moment to respond to our good colleague's dissenting opinion herein, which criticizes us for equating the "belligerent and insubordinate conduct" claimed by GES with intimidating and threatening behavior. As the dissent would have it, GES asserts only that plaintiff Stewart engaged in "belligerent" and "insubordinate" conduct that, by dictionary definition of those terms, did not rise to the level of being intimidating and threatening. The dissent thus asserts that "[q]uestioning whether Stewart was, in fact, intimidating or threatening misses the mark in answering whether GES honestly believed

---

[6] Having recognized that there are genuine disputes of material fact as to whether GES's claim of "belligerent and insubordinate conduct" is false or has changed over time, we reject the alternative ground for summary judgment that has been advanced by GES: that Stewart has failed to demonstrate a prima facie case of retaliation under the *McDonnell Douglas* burden-shifting framework, in that "Stewart's abusive tirade clearly constitutes an intervening event such that causation cannot be established, even assuming sufficient temporal proximity." *See* Br. of Appellee 15. Moreover, because our decision does not turn on there being a dispute as to whether profanity alone could have been a plausible excuse for Stewart's termination, we refrain from unnecessarily addressing GES's challenge to the adequacy and admissibility of Denning's declaration that profanity was widely used at the GES plant. *See id.* at 18-19 (contesting Denning's statement as "nothing more than a conclusory allegation" and "pure hearsay").

29

he was belligerent and insubordinate." *See post* 42. "And based on Stewart's admitted conduct," the dissent "see[s] no genuine dispute of material fact on that front." *Id.*

What the dissent overlooks, however, is that GES itself has equated Stewart's purported "belligerent and insubordinate conduct" with intimidating and threatening behavior. GES does so in this Court, *see* Br. of Appellee 17, and it did so in the district court, *see* J.A. 33-34, 64. Indeed, the district court not only appreciated, but endorsed, GES's analogy. *See* Summary Judgment Opinion 17. Stewart, too, has understood that in blaming his termination on "belligerent and insubordinate conduct," GES means intimidating and threatening behavior. *See* Br. of Appellant 10-11, 13-14; J.A. 467. We therefore have properly proceeded with the same understanding, and it is our dissenting friend who misinterprets GES's "belligerent and insubordinate conduct" claim.

Based on that misinterpretation, the dissent goes on to wrongly insist there is "no substantial difference" between Garcia advising Stewart he was being terminated because of "the way you talked to [Gordon]" and Garcia's later declaration that the termination was because of Stewart's "belligerent and insubordinate conduct." *See post* 43-44 (quoting J.A. 151, 217). That is, the dissent proclaims that "the 'way' Stewart spoke to Gordon was, in fact, 'belligerent and insubordinate.'" *Id.* at 44. The dissent thereby ignores the substantial difference between blaming the termination on "the way you talked to [Gordon]" and blaming the termination on conduct so egregious that it rose to the level of being intimidating and threatening.

Concomitantly, like the district court, the dissent fails to view the facts and inferences drawn therefrom in the light most favorable to Stewart. Although the dissent

30

allows that the GES plant "sounds like an awful place to work" because of "prevalent racism, profanity and vulgarity," the dissent deems the record to show "[w]ithout a doubt" that GES terminated Stewart not for his discrimination complaints, but for "hurling obscenities so loud that other employees had to get involved." *See post* 44-45. We, on the other hand, abide by our obligation to view the facts in Stewart's favor and thus discern a genuine dispute as to whether retaliation was a but-for cause of his termination.

## C.

Finally, because these proceedings will be ongoing due to our remand, we think it prudent to acknowledge that, to date, neither our Court nor the district court has been well served by the parties' respective lawyers. Following are several examples of what has especially troubled us.

## 1.

Understandably, plaintiff Stewart has sought to rely on direct and circumstantial evidence of Gordon's retaliatory animus, including Stewart's own account of being warned by Gordon not to associate with complaining African American coworkers, as well as Denning's account of Gordon threatening to fire Denning if he continued speaking up about racism in the workplace. Nevertheless, Stewart inexplicably failed in the district court to identify a basis for imputing Gordon's alleged animus to GES. *See* Summary Judgment Opinion 16 n.9 (observing that Stewart had not made "any argument as to why any retaliatory animus on Gordon's part could be imputed to GES," such as "under a 'cat's paw' theory of liability").

31

Only now, on appeal, has Stewart done so, contending that under the cat's paw theory, Gordon's retaliatory animus can be imputed to GES in that "[i]t was Gordon who characterized Stewart as threat[en]ing" and "Gordon's evidence formed the basis of GES's decision to terminate Stewart." *See* Br. of Appellant 19 (citing, inter alia, *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011), which explains that "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the . . . employment action, then the employer is liable" (footnote omitted)). We have not considered this argument, however, because Stewart failed to advance it in the district court. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (advising "that issues raised for the first time on appeal generally will not be considered").[7]

2.

For its part, GES has insisted that it terminated plaintiff Stewart for "belligerent and insubordinate conduct" beyond the mere use of profane language, without ever providing a clear and consistent explanation of what this purported conduct entailed. On this issue, GES has presented no declarations of its designated decisionmakers Azkona and Baroja, and GES instead relies on declarations of Garcia and Gordon. Although GES asserts that the termination followed an investigation, the only other evidence concerning the

---

[7] Fortunately for Stewart, we have concluded that he can otherwise avert summary judgment by proceeding under the *McDonnell Douglas* burden-shifting framework.

investigation is Gordon's unsworn and undated written account of the events of June 13, 2017.

According to Gordon's written account, Stewart physically intimidated Gordon during their interactions first in Gordon's office and then outside, particularly by "back[ing] [Gordon] into [an outside] barrier wall and against a fence where I felt trapped." *See* J.A. 206. After Gordon "remove[d] myself from the situation" and "move[d] away from [Stewart]," Garcia and other administrators "came out of their offices due to the commotion" and "tried to speak calmly with [Stewart]." *Id.* Stewart responded by "yelling and cursing at those employees" and "calling them names." *Id.*

In striking contrast to Gordon's written account, however, Garcia's declaration is devoid of any assertion that Stewart yelled and cursed at Garcia and called Garcia names, or that Stewart yelled and cursed at other employees and called them names in Garcia's presence. Moreover, the first of Gordon's own two declarations recounts just that Stewart "called [a single] employee, Tiffany Robertson, a 'bitch' after she came out to calm Stewart down." *See* J.A. 213.

Meanwhile, Gordon's first declaration makes no mention of Stewart backing Gordon into a barrier wall and trapping him against a fence. Rather, Gordon's first declaration only generally asserts that Gordon "felt threatened . . . because Stewart was physically close to me and he was simultaneously acting in a belligerent manner." *See* J.A. 213.

Both Garcia's declaration and Gordon's second declaration specify that Stewart was terminated because of his conduct toward Gordon alone, and not Robertson, Garcia, or

33

anyone else. Garcia's declaration contains no details of that conduct, merely explaining that there "was an altercation between Stewart and Gordon," that Garcia himself "did not witness the altercation," that "Stewart was suspended while GES conducted an investigation of the incident," and that Stewart was then terminated because GES "simply could not tolerate such belligerent and insubordinate conduct from an employee." *See* J.A. 217.

Rather than providing clarity as to what Stewart's alleged "belligerent and insubordinate conduct" entailed, GES's briefing in the district court and this Court has further muddied the waters. Inconsistent with its already-inconsistent evidence, GES has provided a factual statement in which, while outside on June 13, 2017, Stewart first called Robertson a "bitch," then "continued [to] swear and yell at other employees," and only thereafter "trapped Gordon in front of a barrier wall," apparently with the other employees watching. *See* J.A. 51 (internal quotation marks omitted); *see also id.* at 434; Br. of Appellee 4-5.

GES has also maintained — patently falsely — that Stewart "freely admits to . . . misconduct" including "physically trapping [Gordon] in front of a barrier." *See* J.A. 64; *see also* Br. of Appellee 15 (again falsely asserting that "[i]t is not disputed that Stewart . . . physically trapp[ed] [Gordon] in front of a barrier," as "Stewart admits to this misconduct").

34

Turning to the non-retaliatory reason for Stewart's termination articulated by GES in these proceedings, GES has variously blamed the termination on the following:

(1)    A purely verbal but intimidating and threatening attack on Gordon, in which Stewart loudly and belligerently yelled at Gordon and called him a "motherfucker" and a "fat motherfucker" several times;

(2)    The verbal attack on Gordon plus a physical one, in which Stewart trapped Gordon in front of a barrier wall; and

(3)    The verbal and physical attacks on Gordon, along with a verbal attack on Robertson that included calling her a "bitch."

In the district court, GES's summary judgment memorandum articulated reason (2). *See* J.A. 64.  GES's subsequent objections to the magistrate judge's Report first articulated reason (1) and then four pages later claimed reason (3). *See id.* at 433, 437.  Now on appeal, GES's response brief similarly first articulates reason (1) and then three pages later claims reason (3). *See* Br. of Appellee 12, 15.

Consequently, when we refer throughout today's decision to Stewart's purported "belligerent and insubordinate conduct," we have been left by GES to do so with no clear understanding of what this conduct allegedly entailed.[8]

---

[8] We note that because Stewart has not made an issue of GES's failure to clearly and consistently explain what the purported "belligerent and insubordinate conduct" entailed, it is not one of the bases for our vacatur of the district court's summary judgment award to GES on Stewart's retaliatory discharge claim.  We instead rely on a different inconsistency, that being the inconsistency between what Stewart says GES told him (that he was being terminated solely because he used profane language) and what GES now claims (that the termination was based on "belligerent and insubordinate conduct" beyond the mere use of profanity).

3.

In addition to misstating the record as to plaintiff Stewart's purported "belligerent and insubordinate conduct," GES has misstated the record as to other matters, including its internal investigation of Yarbrough the day after Stewart's termination on June 21, 2017. Seeking credit for conducting the investigation and issuing Yarbrough a written reprimand, GES has asserted that it "investigated [Stewart's] allegations of racially insensitive comments by Yarbrough," and that "Yarbrough denied using the word 'n[*****]' with [Stewart]" but "admitted that he had used 'slave driver' on one occasion in April 2017." *See* J.A. 52 (footnote omitted); *see also* Br. of Appellee 5.

What the record actually shows is that although Stewart's written statement to GES of June 14, 2017, included express complaints about Yarbrough's "n***** slave driver" comment and racist "chicken" cartoon (as well as the unpunished "stupid n*****s" comment that Yarbrough had reported to Stewart), GES investigated only Yarbrough's alleged "n***** slave driver" comment. And in doing so, GES informed Yarbrough that he had been accused of using the term "slave driver," not "n***** slave driver." Yarbrough then confessed to the only accusation that GES presented to him, admitting he used the term "slave driver." Contrary to GES, the record in no way reflects either that GES investigated all of the "racially insensitive comments" alleged by Stewart or that Yarbrough denied using the word "n*****" with Stewart.

To be fair, however, GES is not alone in misstating the record. Most glaringly, Stewart has repeatedly and falsely asserted that the record shows Gordon, like Stewart, used profane language in their interactions on June 13, 2017. For example, in his

36

opposition to GES's summary judgment motion, Stewart insisted that the record reflects "[t]here was a heated discussion between Gordon and [Stewart]" in which "[b]oth used profanity." *See* J.A. 263; *see also id.* at 270 (reiterating contention that "both of them used profanity towards each other"). On appeal, Stewart persists in asserting, without evidentiary support, that Gordon joined Stewart in using profanity. *See* Br. of Appellant 4, 9, 13-14.

* * *

In these regrettable circumstances, the courts' work to adjudicate this case has been needlessly complicated. We thus admonish the lawyers to proceed more honestly and carefully from here on out.

IV.

Pursuant to the foregoing, we vacate the district court's award of summary judgment to GES on plaintiff Stewart's retaliatory discharge claim, and we remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*

37

QUATTLEBAUM, Circuit Judge, dissenting:

One thing is clear—GES Recycling South Carolina, LLC's facility in Union County, South Carolina was, by Eddie Stewart's account, a terrible place to work. The record demonstrates his fellow employees made many offensive and racist comments. In fact, Stewart's supervisor, Adam Gordon, made a derogatory gesture to Stewart just moments before Stewart's June 13, 2017 outburst. Against this backdrop, Stewart brought three claims against GES—hostile work environment, race discrimination and retaliation. The district court granted summary judgment to GES on all of them.

Stewart appeals only his retaliation claim. As to it, despite evidence of racially offensive and unquestionably inappropriate remarks, I cannot join the majority's reversal of summary judgment. That's because regardless of how toxic the workplace was, Stewart has failed to raise a genuine dispute of material fact on whether his protected activity of reporting workplace discrimination to Gordon was the but-for cause of his termination.

Section 1981 of Title 42 of the United States Code prohibits racial discrimination in making and enforcing contracts. And the Supreme Court has said § 1981 includes employment retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). So here, to survive summary judgment on his retaliation claim, Stewart must raise a genuine dispute of material fact on whether (1) he engaged in protected activity by opposing discrimination in the workplace, (2) he was subject to an adverse action by his employer and (3) there was a causal link between the two. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc).

38

To start, the majority rightly decides that Stewart has waived any cat's paw theory of retaliation relying on evidence of Gordon's animus to impose liability on GES.[1] So, the majority proceeds to look at Stewart's circumstantial evidence under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2]

I've made my views on *McDonnell Douglas* known. *See Hollis v. Morgan State Univ.*, 153 F.4th 369, 387–95 (4th Cir. 2025) (Quattlebaum, J. concurring). First, I take issue with its origin—it is judicially-manufactured and applies "an evidentiary framework for trials in a bygone era when judges, not juries, decided Title VII cases." *Id*. at 389. Second, I take issue with its application—it can be underinclusive, heighten the summary judgment standard and unnecessarily complicate judicial review. *See id*. at 391–95. And third, it's unnecessary. Without *McDonnell Douglas*, a plaintiff bringing a retaliation claim would still need to show protected activity, an adverse employment action and causation between the two, which are the same elements *McDonnell Douglas* analyzes without all the complicating back and forth.

---

[1] The term "cat's paw" derives from one of Aesop's fables in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). In the end, the cat is left with burnt paws and the monkey gets the chestnuts. *See id*. And while the fable may have tenuous relevance to the employment law theory bearing its name, it represents the common-sense notion that if you trust a smooth talker, you may be left holding the bag. Here, on Stewart's cat's paw theory of retaliation, even if it weren't waived, Stewart has failed to show Gordon intended to cause his termination. *See id*. at 422 ("[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." (emphasis in original) (footnote omitted)).

[2] And to be fair, the district court did too.

39

But aside from my disagreement with *McDonnell Douglas* generally, I disagree with the majority's assessment of it here. I'll assume, for the sake of consistency with the majority's analysis under *McDonnell Douglas*, that Stewart has made out his prima facie case of retaliation by relying on the close temporal proximity between his protected activity and termination.[3] *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (finding an inference of causation where protected activity and termination were "so close" in time); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (finding temporal proximity "far from conclusively establishes the requisite causal connection, [but] it certainly satisfies the less onerous burden of making a prima facie case of causality").

Still, the *McDonnell Douglas* framework provides that mere inference isn't enough to satisfy but-for causation because an employer may articulate a legitimate, nonretaliatory reason for an adverse action. 411 U.S. at 802. Here, the one GES offered is that Stewart exhibited "belligerent and insubordinate conduct" toward Gordon on June 13, 2017. J.A. 217.

---

[3] But this requires a generous assumption. Because temporal proximity is not the end all be all. Even with temporal proximity there are other reasons there may be no inference of causation. *See Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) ("The causal connection may be severed . . . by some legitimate intervening event.") (quoting *Halloum v. Intel Corp.*, ALJ No. 2003-SOX-7, 2004 WL 5032613, at *16 (Dep't of Lab. Mar. 4, 2004)); *see also Sigley v. ND Fairmont, LLC*, 129 F.4th 256, 260 n.1 (4th Cir. 2025) (finding no reasonable inference that a plaintiff "was fired because of his disability rather than his dishonesty" where he admitted that he lied on a medical questionnaire about physical abilities). But because I find Stewart has failed to raise a genuine dispute of material fact on pretext, I need not address these points. *See Vannoy v Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (assuming without deciding a plaintiff could establish a prima facie case under *McDonnell Douglas* in FMLA retaliation case).

So, to survive summary judgment, a plaintiff must put forth evidence that, in spite of the employer's stated legitimate reason for termination, would still "allow a jury to infer that the [real] reason" was retaliation. *Hollis*, 153 F.4th at 381. *McDonnell Douglas* calls this "pretext." 411 U.S. at 804. Here, that means Stewart must show that while GES says he was fired for one thing—belligerent and insubordinate conduct—that was really pretext and he was actually fired for another—engaging in protected activity.

The majority finds Stewart has raised a genuine dispute of material fact because GES's stated reason was untrue in two ways. First, the majority says a dispute exists over whether Stewart was in fact belligerent and insubordinate. *See* Maj. Op. at 23. But that asks the wrong question. The question is whether GES's decisionmaker honestly believed Stewart was belligerent and insubordinate. *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 177 (4th Cir. 2023) (holding "a plaintiff must rebut the fact that the decisionmaker honestly believed" a plaintiff's conduct was threatening, "regardless of whether the plaintiff did in fact issue the threats" (citation modified)). But the majority's answer is wrong framed under either question.

According to the majority, the entirety of the altercation, which includes Stewart's admissions of calling his boss a "m**********r"[4] repeatedly, J.A. 133, 134, 194, raising his voice, telling a coworker to "go the f**k on back" to her office, J.A. 137, and management's intervention to deescalate the situation and send Stewart home for the day

---

[4] I agree with the majority's choice to sanitize some of the abhorrent language alleged. But I've done so more broadly. I think my mother, who reads my opinions, will approve.

does not indicate Stewart was belligerent and insubordinate. That's because nothing Stewart did was, according to the majority, "intimidating and threatening." Maj. Op. at 23. Respectfully, I disagree. GES said "belligerent and insubordinate." J.A. 217. Not "intimidating and threatening." Maj. Op. at 23. Belligerent means "inclined to or exhibiting assertiveness, hostility, or combativeness." *Belligerent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).[5] And insubordinate means "disobedient to authority." *Insubordinate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Stewart's admitted conduct plainly qualifies. Questioning whether Stewart was, in fact, intimidating or threatening misses the mark in answering whether GES honestly believed he was belligerent and insubordinate. And based on Stewart's admitted conduct, I see no genuine dispute of material fact on that front.[6]

---

[5] This edition was in effect at the time of the altercation, at the time of Ander Garcia's written declaration and at the time of the district court's summary judgment opinion.

[6] And with respect to my colleagues in the majority, any dispute about what exactly happened after the altercation between Stewart and Gordon spilled out of Gordon's office doesn't create a genuine dispute of material fact. If, at that point, Stewart backed Gordon up against a barrier wall and fence where he felt trapped that would only be additional evidence that the reason GES gave for terminating Stewart was not pretextual. *See* J.A. 206. If that didn't occur, Stewart still undisputably called his boss a "m**********r" multiple times in a way that was loud enough to cause other GES employees to intervene and send Stewart home for the day. J.A. 133, 134, 194. In my view, that is enough to foreclose any genuine dispute of material fact on whether GES's stated reason for terminating Stewart—because he was belligerent and insubordinate—was pretextual. *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 764 (4th Cir. 2021) (finding a genuine dispute of material fact where those facts helped "prove the existence of a dispositive issue").

Second, the majority questions whether GES's explanation for Stewart's firing shifted over time. *See* Maj. Op. at 26–27. On this point, the majority points to the fact that Stewart stated in his deposition that Ander Garcia told him he was fired for "the way [he] talked to [Gordon]." J.A. 151. But nearly six years later, Garcia's written declaration stated Stewart was terminated for "belligerent and insubordinate conduct." J.A. 217. To the majority, those are different because the former refers only to Stewart's profanity as the reason for termination. *See* Maj. Op. at 27. That, plus the fact profanity was commonplace at GES,[7] supposedly means there is a genuine dispute of material fact on this front because GES couldn't have genuinely fired Stewart for profanity alone in a workplace where profanity was common. *See* Maj. Op. at 28.

But that's not a genuine dispute. Not just any change in reason suffices to show pretext. Rather, a change in reason must be "substantial." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 226 (4th Cir. 2019) And "an employer is certainly permitted to expand on its original reason for a termination." *Id*. "[M]inor discrepancies that do not cast doubt on the explanation's validity . . . [do] not create a "genuine" dispute." *Hux v. City of Newport News, VA*, 451 F.3d 311, 315 (4th Cir. 2006).

---

[7] Stewart goes so far as to say that the fact that he called Gordon a "m**********r at least three times" before being suspended shows he couldn't have been fired for profanity—because if GES truly wanted to fire him for profanity, he should have been fired after saying it the first time. Op. Br. at 12. But this only undercuts his pretext argument—he wasn't fired for profanity alone. He was fired for the "way" he spoke to his supervisor, or the entirety of the altercation. J.A. 151.

Here, there's no substantial difference between GES's oral and written statements. One statement is general—"the way you talked to [Gordon]." J.A. 151. The other is specific—"belligerent and insubordinate conduct." J.A. 217. It's like telling one of your golfing buddies that you can't play today because of the weather and telling another that you can't play because there's rain and lightning. The two statements are not inconsistent—the weather that kept the golfers from playing was rain and lightning. In the same way, the "way" Stewart spoke to Gordon was, in fact, "belligerent and insubordinate."

Nor can there be a genuine issue of material fact based on what Stewart understood "the way you talked to [Gordon]" to mean. J.A. 151. The focus here is whether GES's reason changed, not how Stewart interpreted it. *Hux*, 451 F.3d at 315 ("[A] plaintiff cannot seek to expose [an employer's] rationale as pretextual . . . by raising points that are wholly irrelevant to it.").

Recall that Gordon called Stewart into his office for a private conversation, and Stewart responded by calling Gordon a "m**********r" repeatedly while describing a litany of offensive conduct, including some by Gordon himself. J.A. 133, 134, 194. And that then culminated in multiple employees intervening in their loud altercation and Stewart being sent home for the day. Stewart concedes all this happened. So, was the profanity part of the problem? Sure. But was it also that Stewart was hurling obscenities so loud that other employees had to get involved? Without a doubt. We shouldn't be splitting hairs here. There is no genuine dispute that GES has honestly believed throughout proceedings that Stewart was hostile and defiant both in what he said and how he said it.

44

In sum, GES's Union County location sounds like an awful place to work. The record reflects prevalent racism, profanity and vulgarity. I don't condone or minimize any of that conduct. But the only question before us is whether the district court properly granted summary judgment on Stewart's *retaliation* claim. And the only issue on that claim is whether Stewart has raised a genuine dispute of material fact on whether GES's stated reason for terminating him—for belligerent and insubordinate conduct—was untrue. For the reasons I've explained, he hasn't. As a result, he has failed to withstand summary judgment on whether his protected activity was the but-for cause of his termination. So, I would affirm the district court's grant of summary judgment to GES on his retaliation claim.

I respectfully dissent.